1   David Sanford (DC Bar No. 457933, *Pro Hac Vice forthcoming*)
  dsanford@sanfordheisler.com
2   **SANFORD HEISLER SHARP, LLP**
3   1666 Connecticut Ave, NW, Suite 300
  Washington, DC 20009
4   Telephone: (202) 499-5200
  Facsimile: (202) 499-5199
5

6   Jill Sanford (CA Bar No. 185757)
  jsanford@sanfordheisler.com
7   Edward Chapin (CA Bar No. 53287)
  echapin2@sanfordheisler.com
8   **SANFORD HEISLER SHARP, LLP**
9   655 W Broadway, Suite 1700
  San Diego, CA 92101
10   Telephone: (619) 577-4253
  Facsimile: (619) 677-4250
11

12   Jeremy Heisler (NY Bar No. 1653484, *Pro Hac Vice forthcoming*)
  jheisler@sanfordheisler.com
13   Alexandra Harwin (DC Bar No. 1003018, *Pro Hac Vice forthcoming*)
  aharwin@sanfordheisler.com
14   **SANFORD HEISLER SHARP, LLP**
15   1350 Avenue of the America, 31st Floor
  New York, NY 10019
16   Telephone: (646) 402-5650
  Facsimile: (646) 402-5651
17

18   *Attorneys for Plaintiff and the Classes*
  [*Additional Attorneys Listed After Signature Page*]

19 

          UNITED STATES DISTRICT COURT
20        NORTHERN DISTRICT OF CALIFORNIA
           SAN FRANCISCO DIVISION

| | |
|---|---|
| 21 DAWN KNEPPER, on behalf of herself and all | **Case No.: 3:18-CV-00303** |
| 22 others similarly situated, | **CLASS AND COLLECTIVE** |
| 23                Plaintiff, | **ACTION COMPLAINT** |
| 24 v. | |
| 25 OGLETREE, DEAKINS, NASH, SMOAK & | |
| 26 STEWART, P.C. | **DEMAND FOR JURY TRIAL** |
| 27             Defendant. | |

28

Plaintiff Dawn Knepper ("Plaintiff Knepper" or "Ms. Knepper" or "Class Representative") is a current attorney and non-equity shareholder of Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Defendant," "Ogletree," or "the Firm").   On behalf of herself and all similarly situated female non-equity shareholders at Ogletree, Plaintiff alleges systematic gender discrimination by Ogletree, as follows:

## I.   **INTRODUCTION**

1.      Defendant Ogletree is one of the largest defense-side labor and employment law firms in the country, employing nearly 700 attorneys in the United States.  Ogletree defends employers against individual and class action employment lawsuits, including discrimination actions.  Ogletree also advises employers on how to avoid discrimination suits.

2.      According to its website, Ogletree advises clients on compliance with federal and state employment laws in order "to provide a positive workplace…." For its own part, Ogletree claims to be "committed to diversity," which it says "makes us better—as lawyers and people." It purports to "foster diversity and inclusion as an integral part of the firm's overall professional development efforts." But this rhetoric is largely hollow.  In reality, the Firm has shirked its obligations under the law through its "do as I say not as I do" practices.  Upon information and belief, when a female shareholder asked the Managing Shareholder of the Firm, Matt Keen, about the Firm's response to gender discrimination complaints, he explained, "we're not real good at practicing what we preach."

3.      Ogletree's female shareholders face discrimination in pay, promotions, and other unequal opportunities in the terms and conditions of their employment.  Male shareholders are disproportionately over-represented at every level of the Firm's management and leadership structure.  Through formal policies and widespread practices, the Firm's male leadership interferes with, limits, or prevents female shareholders from receiving the appropriate credit for the business they bring to the Firm and their hard work in running complex and demanding cases day-to-day. All the while, their male colleagues reap the professional and financial profits that women generate.  The Firm, dominated by male decision makers, also denies female shareholders the same business development and training opportunities provided to their male counterparts. Female shareholders are not selected for business pitches at the same rate as similarly situated, and in some cases less qualified, male attorneys. Through these practices the Firm

---

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT
1

systematically overlooks, devalues, or undermines female attorneys as business generators, which adversely impacts their pay and promotion.

4.      Plaintiff is a female non-equity shareholder currently employed by Ogletree.  She brings this action as a non-equity shareholder alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Equal Pay Act of 1963, 29 U.S.C. §§ 206 *et seq.* ("EPA"), and related California statutes, seeking redress and programmatic change for female non-equity shareholders who have worked or will work for Ogletree.

## II.      THE PARTIES

### A.  Plaintiff Dawn Knepper

5.      Plaintiff Dawn Knepper ("Plaintiff Knepper" or "Ms. Knepper" or "Class Representative") is a female attorney and non-equity shareholder in Ogletree's Orange County office.

6.      Plaintiff Knepper has been employed by Ogletree since approximately June 1, 2005.

### B.  Defendant Ogletree

7.      Defendant Ogletree is a law firm with offices worldwide, including six offices in California.  Ogletree's California offices are located in Los Angeles, Orange County, Sacramento, San Diego, San Francisco, and Torrance.  Ogletree employs over 100 attorneys in California.

8.      During all relevant times, Ogletree was Plaintiff's employer within the meaning of all applicable federal and state statutes.

## III.      JURISDICTION AND VENUE

9.      The U.S. District Court for the Northern District of California has personal jurisdiction over Defendant because Ogletree has offices in California and does business in California, and many of the acts complained of and giving rise to the claims alleged herein occurred in California.

10.      This Court has subject matter jurisdiction over the claims under Title VII and the EPA pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).  These claims arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

11.      This Court may exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).  Defendant conducts substantial business in San Francisco and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district.

13.     Plaintiff has exhausted her administrative remedies under Title VII.  Plaintiff filed a charge of gender discrimination individually and on behalf of all similarly situated female shareholders employed by Ogletree with the Equal Employment Opportunity Commission ("EEOC") and the California Department of Fair Employment and Housing ("DFEH").  Plaintiff Knepper duly filed her administrative charge before the EEOC and DFEH on December 21, 2017 and received her Notice of Right to Sue from the EEOC and DFEH on January 9, 2018.

14.     This Complaint is made within ninety days of the receipt of the Plaintiff's EEOC Notice of Right to Sue and DFEH Notice of Right to Sue.

## IV.     FACTUAL ALLEGATIONS

### A.  Ogletree's Male-Dominated Hierarchy

15.     Men dominate Ogletree's leadership and management.  Women hold only two of nine seats on Ogletree's Board of Directors and two of six Firm Officer positions; one of these two officer positions was added as recently as December 2017.  Compensation decisions at Ogletree are centrally controlled by its Compensation Committee, which is comprised predominantly of male members.  Compensation is then voted on by Ogletree's equity shareholders, approximately 80% of whom are men.

16.     Ogletree discriminates against women by permitting its predominantly male leadership to favor men overtly in pay, promotions, and other opportunities regardless of their qualifications and to otherwise discriminate against women.  Women hold fewer than 20% of equity shareholder positions, and fewer than 42% of non-equity shareholder positions.  Ogletree leadership fosters or condones a Firm culture that marginalizes, demeans, and undervalues women.

17.     Upon information and belief, the overrepresentation of men in Ogletree's leadership is both the source and product of continuing systemic discrimination against female shareholders.

18.     Upon information and belief, Ogletree's leadership is aware of the Firm's inequitable pay, promotion, job assignment, and other practices, but have taken no steps to remedy the root causes of the

disparity. Ogletree is aware of the demographics of its workforce, including the underrepresentation of women in different levels and functions.

19. Ogletree, one of the nation's largest employment law firms, regularly advises companies on how to comply with pay equity laws and to avoid, investigate, and remedy discrimination claims. Upon information and belief, Ogletree has been aware of its own misconduct for years but the Firm has failed to rectify the discrimination and actively sought to avoid the changes necessary to comply with the law.

**B. Ogletree's Common Compensation and Promotion Policies**

20. Ogletree discriminates against Plaintiff and female shareholders with respect to compensation and promotions through the use of common policies and procedures.

i.    Equity and Non-Equity Shareholder Policies

21. Ogletree's shareholders are divided into two groups: equity shareholders and non-equity shareholders. The Firm uses the equity and non-equity tiers to distribute compensation. These tiers allow predominately male attorneys to rely on arbitrary, subjective criteria to deny female shareholders promotions, equity status, pay, and compensation commensurate with their skill, experience, and contributions to the Firm.

22. In order to be brought into the Firm at or promoted to shareholder level, attorneys must be recommended by Ogletree's predominantly male Board of Directors and local shareholders, then receive 75% of Ogletree's equity shareholders' votes. Ogletree's equity shareholders are approximately 80% men.

23. This male-dominated system makes it extremely difficult for female non-equity shareholders to be promoted and paid at the same levels as equity shareholders, although they perform substantially similar work. Indeed, Ogletree's equity and non-equity positions are identical except for the pay and power the Firm gives them.

24. Ogletree's Equity and Non-Equity Shareholders policy explains that, "Expectations for both Equity and Non-Equity shareholders are the same with regard to technical and professional qualifications, experience, personal effort, managing and developing associates and staff, and contributions to the Firm as a whole." However, Ogletree pays its predominantly-male equity

shareholders monthly profit-sharing distributions which can increase their target compensation by approximately up to 40%.

25. Ogletree routinely refuses to promote qualified female non-equity shareholders to equity shareholder status, even when they generate business that meets or exceeds the criteria and expectations for equity shareholders. At the same time, the Firm has eased business generation requirements in order to promote favored male attorneys to equity status. These policies disparately impact Ogletree's female non-equity shareholders.

ii. Common Credit Allocation and Compensation Policies

26. Compensation decisions at Ogletree are centrally controlled by its Compensation Committee, which until recently had no more than one woman among its five members. The Compensation Committee for 2018 compensation now, for the first time, has two women on it; since 2013 only a single female sat on the Compensation Committee—before that year, the Compensation Committee was comprised solely of men.

27. In the compensation-setting process, Ogletree's shareholders receive credit for their work in five main categories: originating credits, managing credits, responsible credits, working credits, and billable hours. Ogletree's Origination Credit Principles policy states that, "The originating, managing, responsible and working attorney statistics should be utilized as a source of objective information for the Compensation Committee to make *subjective* judgments about shareholder compensation. *A formula is strongly disfavored.*" (emphases added). This subjectivity allows the Firm's male leadership to control all compensation at the Firm and results in discrimination against female attorneys. On average, Ogletree currently pays its male shareholders approximately $110,000 more than its female shareholders, in target compensation and bonus alone.

28. Ogletree defines an *originating attorney* as "The attorney(s) bringing the client to the Firm for legal representation. In some cases, origination credit for a matter may be divided among several attorneys." In practice, whichever attorney establishes the Firm's initial relationship with a potential client is thereafter considered the originating attorney for all of that client's business over the entire course of the client's relationship with the Firm. The originating attorney has total discretion to allocate origination

credits in perpetuity. Only once an attorney seeks redress through the appeals process can the Firm's Managing Shareholder overturn the originating attorney's decision. In practice, the Firm's Managing Shareholder rubber stamps the allocations made by predominantly male originating attorneys. Male attorneys, who disproportionately control decision-making authority, disproportionately assign origination credits to other male attorneys. This allows male attorneys to receive an inordinate number of origination credits and allocate other credits to male attorneys even when female attorneys bring the relevant business to the Firm. The Firm's discriminatory practices have caused a substantial gender-based disparity in origination credits throughout the Firm—between 2014 and 2016, the average amount of origination credits for male shareholders was nearly *double* that of female shareholders.

29.     Ogletree defines the *managing attorney* as "The attorney responsible for overall management of the work, and relationship with the Firm, pertaining to a particular client. This may include billing responsibilities." According to this policy, managing attorneys are generally the attorneys in charge of communicating with clients and managing the client's expectations and the work that is done to meet them.

30.     Ogletree weighs origination and, to a lesser extent, managing credits heavily in making compensation decisions, while responsible attorney and working credits have very little impact on compensation.

31.     By Firm practice, originating attorneys have been given the discretion to distribute origination, managing, responsible, and working credits in an arbitrary, subjective, or biased manner. The Firm allows originating attorneys to choose which attorneys will share origination credits and which will receive managing credits on that matter. Originating and managing attorneys then direct responsible and working attorneys to do the actual work on a matter. As a result, predominantly male managing and originating shareholders receive a disproportionate amount of the meaningful credit and compensation.

32.     Ogletree defines the *responsible attorney* as "The attorney responsible for coordination management, strategic planning, staffing and overall success in the Firm's handling of a *particular matter*." (emphasis added).

33.     The applicable distinction between a managing attorney, who receives managing credit,

---

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT

6

and a responsible attorney, who receives responsible credit, is that the managing attorney purportedly manages the *client relationship* while the responsible attorney is responsible for the overall success of the *matter*.

34.     Ogletree defines a *working attorney* as "the attorney who is working on the case." Billable hours, responsible credits, and working credits are the most objective metrics that are considered in compensation decisions, but have the least impact on compensation. Consequently, the compensation rubric is stacked in a way that favors male attorneys.

35.     Female attorneys are disproportionately assigned to be responsible or working attorneys, as opposed to originating or managing attorneys. This is the case even when female attorneys handle all of the tasks that are supposed to be completed by managing attorneys and for which managing attorneys receive credit, including client contact, performing or managing the bulk of the actual work, and handling other aspects of a matter. Indeed, female responsible or working attorneys are also frequently charged with billing and collection or preparing status reports for originating and managing attorneys who are unfamiliar with that matter, so those attorneys can communicate knowledgeably with the client.

36.     After the proposed compensation recommendations were announced at the end of January 2017, but before the numbers were approved by the equity shareholders, a large number of women shareholders met to discuss pay equity and raised the issue to Ogletree Deakins's Women's Initiative ("ODWIN"). When female shareholders proposed asking that that the Board of Directors conduct a pay equity audit, the head of ODWIN explained that there was nothing she could do and that the Board thought the female shareholders from California who had been complaining were "crazy." Nevertheless, multiple female shareholders continued to complain about compensation and the unfair allocation of credits. In response, the Firm announced a process to appeal origination disputes—creating the façade that aggrieved shareholders could contest an originating attorney's allocations. Upon information and belief, while setting up this appeal process, Ron Chapman, the highest paid male shareholder in the Firm – who benefits enormously from the discriminatory practices – announced to the other newly-appointed members of the credit appeal process, "We need to make it really hard to use because we don't want people to use it." Ogletree's old boys' club has created and maintained a blatantly discriminatory system in order to

underpay women and make recourse inaccessible or impossible.

        iii.    Common Promotion Policies

37.    Ogletree's promotion policies and practices have created a glaring gender disparity in seniority at the Firm.  Because the Firm does not promote women at rates remotely equal to those of similarly situated men, women represent a progressively lower percentage of each tier of the Firm as title and compensation rise.

38.    For example, while women represent approximately 58% of Ogletree's associates, only 133, or 32%, of Ogletree's 415 shareholders are women. Of Ogletree's 234 non-equity shareholders, only 97, or 42%, are women.  Of Ogletree's 181 equity shareholders, only 36, or 19%, are women.[1]

39.    In order to maintain control over the Firm and shareholder compensation, Ogletree's male-dominated leadership maintains moving targets for non-equity shareholders pursuing promotion to equity status.

40.    Ogletree's Equity and Non-Equity Shareholders policy sets forth the criteria for promotion to equity shareholder status: $750,000 in origination credits, $750,000 in management credits, $500,000 in working credits, at least 1,800 billed hours per year, and at least 200 "Firm hours."  The Firm frequently requires non-equity female shareholders to meet these thresholds for three consecutive years prior to promotion.

41.    By contrast, there are numerous examples where Ogletree has promoted men who have failed to meet these criteria. In 2017 alone, Kevin Bland, Greg Cheng, William Duda, Bernhard Mueller, and Scott Kelly were promoted to equity shareholder without meeting the promotion criteria for three consecutive years.  Ogletree maintained Keith Watts's equity shareholder status despite Mr. Watts not sustaining the criteria for three consecutive years.

42.    The most flagrant example of such selective promotion is Evan Moses, whom Kim Ebert, the managing shareholder of the Firm at the time, conceded in an open partnership meeting did not come close to meeting the criteria, but the Firm made an exception because of his (grossly inflated) managing

---

[1] Firm demographics are reflected as of December 31, 2017.

1    numbers.   Male equity shareholders Keith Watts and Vincent Verde were promoted under similar
2    circumstances.

3        43.    In contrast, Ogletree promoted only one woman to the equity tier for 2017.   This female
4    shareholder had met every criterion for three years, a standard the Firm did not require of men.

5        44.    The Firm's discriminatory credit allocation system makes meeting the origination criteria
6    for promotion very difficult for female non-equity shareholders to achieve, thereby creating a particularly
7    strong barrier to women's advancement within the Firm.

8        45.    In contrast, the Firm's old boys' club distributes origination credit so that male
9    shareholders are able to meet the requirements without doing the work.   The Firm also enables Board
10   members who seek origination credit for a matter to determine what attorneys achieve what portion of
11   origination credits.   Likewise, the Firm eases these requirements for favored male attorneys who, despite
12   receiving disproportionately high allocations, still have failed to meet these origination thresholds.

13       46.    This system discriminates against and disparately impacts women by denying them
14   promotions and promoting them less often and more slowly than equally or less qualified men.   This
15   impact is apparent in the dwindling proportion of women at each successive level of Ogletree's hierarchy.

16   **C.  Ogletree's Common Business Development and Job Assignment Practices**

17       47.    Female shareholders throughout the Firm are required to assume administrative duties such
18   as office management, paralegal supervision and training, and event planning. These administrative, or
19   "housekeeping," duties take substantial amounts of time from female shareholders while male
20   shareholders are freed from these tasks. Instead, the Firm permits male attorneys to devote their time to
21   case work and business development efforts, which Ogletree values highly and substantially rewards,
22   particularly through compensation.

23       48.    The Firm also requires female shareholders to perform the bulk of the actual legal work on
24   its cases as the "responsible" or "working" attorneys, including client communications, legal research,
25   developing case strategies, managing work, writing legal documents, and the countless granular tasks
26   involved with litigation.   "Responsible" and "working" credits, however, do not meaningfully affect
27   shareholders' compensation, which is driven by origination and managing credits.

28

---

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT
9

49.     Thus, while female shareholders are disproportionately consumed with casework and administrative tasks that do not affect their compensation, they are prevented from engaging in business development activities. In contrast, their male colleagues are afforded the time and availability to pursue business development efforts and are richly rewarded for doing so.

50.     As female shareholders draft briefs, supervise younger lawyers and non-lawyer staff, and handle a broad range of client demands, the Firm selects male shareholders for pitch meetings, conferences, and other business development opportunities that enable those male shareholders to reap origination credit, management credit, and other compensation that is disproportionate to their contributions.

51.     The result is that female shareholders at Ogletree primarily receive responsible and working credit for their work, while male shareholders disproportionately receive origination and managing credit.  Because Ogletree places exponentially more value on origination and managing credit in its compensation-setting process, the Firm is able to systematically and discriminatorily pay female shareholders less despite their additional duties.

52.     The Firm is also well aware of the disparate impact of its inequitable assignment of administrative roles to female shareholders.  Ogletree has discriminatorily tasked female shareholders, including Ms. Knepper, with handling time-consuming administrative duties, which substantially decrease the amount of time they have to conduct billable work and grow their business.

53.     In contrast, male shareholders rarely handle administrative tasks while Ogletree actively provides them with business development opportunities that women are excluded from, such as pitches, conferences, awards ceremonies, networking events, and other occasions for professional growth.  When male attorneys meet potential clients, the male attorneys frequently demand origination credits despite not bringing the business into Ogletree.  If a female attorney later brings the business from that client to Ogletree, the male hierarchy, abusing their power, frequently takes origination credits, often times deciding a discriminatorily low percentage of credit will be allocated to the female attorney.  When female shareholders complain about the allocation of origination credits, the Firm's male managing shareholder frequently supports the male taking the greater percentage or all of the origination credits, to the female

shareholder's disadvantage.

### V.     PLAINTIFF DAWN KNEPPER

54.     Plaintiff Knepper currently works in Ogletree's Orange County office.

55.     Ms. Knepper received her B.A. from the University of Texas at Austin in 1996. She received her J.D. *with honors* from Golden Gate University School of Law in 2000, the same year she was admitted to the California State Bar.  After law school, Ms. Knepper served as a Staff Attorney for the United States Court of Appeals for the Ninth Circuit.

56.     Ms. Knepper joined Ogletree's San Antonio office on June 1, 2005.  Effective January 1, 2012, Ms. Knepper moved to Ogletree's Orange County Office and became its only female shareholder.

57.     As soon as Ms. Knepper arrived in the Orange County office, she began experiencing disparate treatment and hostility from the office's entirely male leadership – most notably from Keith Watts, the Orange County Office's managing shareholder.

58.     Ms. Knepper soon learned she was being significantly underpaid compared to male shareholders, leading her to complain to the compensation committee about the gender-based compensation disparities in her office as early as the end of 2012.

59.     Ogletree refused to rectify the issues Ms. Knepper raised, and since 2012, has underpaid, underdeveloped, and undervalued her.

60.     Despite this, Ms. Knepper has excelled in her job duties at Ogletree. She was recognized as a Super Lawyers Rising Star every year from 2010 to 2013 and as a Southern California Super Lawyer every year since and is Preeminent AV rated by Martindale-Hubbell.  She is a frequent speaker at Firm and non-Firm events and workshops and regularly contributes to the Firm blogs.  Ms. Knepper has chaired the planning and preparations for the Women's In-House Counsel Institute workshops in 2016 and 2017, a significant event for the office but a non-billable one for Ms. Knepper.

61.     Recognizing her expertise across a range of different practice groups, Ogletree appointed Ms. Knepper as Co-Chair of its cross-practice Sports Entertainment Practice Group.  Ogletree has also selected Ms. Knepper to oversee the Orange County paralegals.

62.     Despite her excellent performance, Ogletree has continually underpaid Ms. Knepper and

refused to promote her.

63.    Ms. Knepper has complained consistently about these issues since 2012, but Ogletree's only response has been to retaliate against her for doing so, leaving her no recourse but to take legal action.

64.    Ogletree's mistreatment of Ms. Knepper is typical of its mistreatment of women throughout the Firm and exemplifies the Firm's discriminatory policies and practices.

        i.    Ogletree Discriminates Against Ms. Knepper in Pay

65.    Ms. Knepper has performed at equal or higher levels than her male comparators, but has been paid less.

66.    When Ms. Knepper transferred to the Orange County office in 2012, she requested to be paid at least equally to Matt Effland, a male shareholder of similar seniority who had recently moved from Indiana to Los Angeles.  In 2011, Ms. Knepper earned higher credits than Mr. Effland in every single category, including approximately over $100,000 higher originations and 100 more billable hours than Mr. Effland.

67.    However, Ogletree set Ms. Knepper's salary and bonus at approximately $100,000 less than Mr. Effland's in 2012, making Ms. Knepper the lowest paid full-time shareholder in California by approximately $60,000.

68.    Ms. Knepper complained about the disparity to multiple members of Ogletree's Board of Directors and compensation committee, but Ogletree responded by increasing her pay by only $10,000, to a level equal to what an associate with *four years less experience* would have made in the Orange County market.

69.    Despite this, in 2012 Ms. Knepper outperformed many of the 27 predominantly male attorneys in Ogletree's $300,000 pay band – substantially higher than she earned – in every compensation credit category, including having higher origination credits than approximately 5, higher managing credits than approximately 13, higher responsible credits than approximately 20, and higher working credits than approximately 15.  In 2012, Ms. Knepper billed approximately 2,100 hours; for reference, the billable hours goal for promotion to equity status is 1,800 hours.

70.    Ms. Knepper presented all of this information to the Compensation Committee and

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT

requested that Ogletree pay her a salary commensurate with her value and performance in 2013.  Instead, Ogletree decided to pay Ms. Knepper approximately $50,000 less than she requested.

71.    Nevertheless, Ms. Knepper maintained her high performance.  In 2013, of the 32 Ogletree attorneys who were paid in the $300,000 band, Ms. Knepper had higher origination and managing credits than 13, higher responsible credits than 24, and higher working credits than 27. Ms. Knepper had higher origination and working credits than Managing Shareholder Keith Watts, as well as approximately 472 more billable hours, yet Ogletree paid Mr. Watts approximately $125,000 more.

72.    In 2014, Ms. Knepper made the Compensation Committee aware of how significantly they were underpaying her and requested the same salary as she requested the previous year, which would have placed her at the bottom of the pay band.  Willfully ignoring this glaring disparity, Ogletree refused to change her salary at all and instead continued to pay her approximately $50,000 less than she requested.

73.    Ogletree continued to pay Ms. Knepper approximately $125,000 less than Mr. Watts in 2014, a year in which she had significantly higher responsible and working credits, as well as approximately 1,341 more billable hours than Mr. Watts.  To this day, Mr. Watts continues to be held to a lower standard than Ms. Knepper and many other female shareholders.  For example, in 2016, Mr. Watts accrued only approximately *64 total billable hours*.

74.    The Firm finally agreed to pay Ms. Knepper a higher salary for the year 2017, after she almost tripled her originations from 2015, though her pay is well under that of her male peers with similar originations and other credits.

75.    Ms. Knepper has repeatedly complained about the gender-based pay discrimination to which Ogletree subjects her.   Ms. Knepper has raised her underpayment in *every* shareholder compensation interview and has submitted follow-up appeals as well.  Her complaints have fallen on deaf ears.

76.    Similarly, in 2017, the Firm circulated a survey as part of an application to be recognized among the Orange County Business Journal Best Places to Work.  In her response to a survey question asking what the Firm could do to improve, Ms. Knepper explicitly requested a pay equity audit.  Mr. Watts never followed up on this pay equity complaint.

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT
13

ii.   Ogletree Discriminates Against Ms. Knepper in Business Development

77.    In addition to underpaying Ms. Knepper and other women relative to male shareholders with substantially similar credits, Ogletree has consistently denied Ms. Knepper opportunities to earn credits in the first place.

78.    In her over 12 years with Ogletree, *Ms. Knepper has never been invited on a business pitch to a prospective client*.  Mr. Watts has purposefully kept Ms. Knepper out of business development opportunities and made it difficult for her to pursue her own opportunities throughout her time in Orange County.

79.    After receiving no significant business development support from Mr. Watts in her first year in the Orange County office, Ms. Knepper emailed Mr. Watts requesting business opportunities.  Mr. Watts took over a month to respond and said only that he would keep her in mind.

80.    Before she came to California, Ms. Knepper managed to become the only non-equity shareholder on Ogletree's Association of Corporate Counsel ("ACC") national team to attend its annual conference.  The ACC is one of the most important business development opportunities available to Ogletree shareholders.  Despite Ms. Knepper's work to elevate Ogletree's standing in the ACC and integrate her clients into it, Ogletree has excluded Ms. Knepper from ACC events.  For example, in 2017, Ms. Knepper requested to speak at an ACC SoCal event, but Mr. Watts denied her the opportunity to even attend the event.  Furthermore, while at the 2017 ACC National Conference in Washington, D.C., Ms. Knepper requested to attend the dinner for ACC SoCal attendees but another male shareholder from Ogletree denied her the opportunity.  Only three shareholders, all of whom were male, were allowed to attend on behalf of the Firm; two of them were not even from Southern California.

81.    Each year Ogletree holds an "In-House Counsel Exclusive" seminar which frequently draws over 800 attendees from around the country and world.  Despite having many of her own clients in attendance, Ms. Knepper has never been allowed to speak at the event.

82.    In September 2016, Ms. Knepper arranged an opportunity to speak with her client at this in-house seminar.  Ms. Knepper proposed they both join the same panel discussion. After learning that Ms. Knepper would not be speaking, her client still requested that she arrange to attend the conference.

Ms. Knepper was denied because there were not sufficient hotel rooms, despite her offer to be flexible in accommodations.  Consequently, the Firm denied Ms. Knepper the opportunity to network with hundreds of potential clients while other predominantly male attorneys networked with Ms. Knepper's client.

83.     In February 2017, Ms. Knepper received an email notifying her that the Anti-Defamation League would honor her client's in-house counsel. Holding her in high-esteem, the client named Ms. Knepper as a confidante whom he admires.  In response, Ms. Knepper asked the Firm to sponsor the award with a $1,500 donation that would also boost her and Ogletree's presence at the dinner ceremony.  Mr. Watts never responded to Ms. Knepper's request.

84.     By contrast, Mr. Watts routinely approved similar requests from male shareholders for costlier, low-profile events.  For example, Mr. Watts approved male-shareholder Michael Sexton's request to sponsor an event with the Orange Catholic Foundation, even though it was unbudgeted.

85.     In June 2017, Ms. Knepper requested permission to nominate one of her biggest clients for an Orange County Business Journal Award.  Mr. Watts did not respond.  After Ms. Knepper followed up with Mr. Watts in July 2017, he told her that her client would have to endure an interview process akin to being put up for shareholder before he would approve their nomination.  In contrast, Vince Verde, a male shareholder, asked Mr. Watts on July 24, 2017 to nominate his client for the same award.  Mr. Watts responded within thirty minutes and told Mr. Verde, "Certainly nominate him and I would be happy to meet him."

86.     Not only did Ogletree routinely deny Ms. Knepper business development opportunities, the Firm stonewalled or denied her efforts to develop business with the Orange County Business Journal In-House Counsel Awards, multiple ACC Galas and ACC Conferences—and these are just a few examples. In contrast, male shareholders have received funding and support for their development opportunities and are frequently invited to benefit from opportunities they did not create, whereas Ms. Knepper has had to generate all of her own business development opportunities.

iii.     Ogletree Discriminates Against Ms. Knepper in Credit Allocation

87.     In addition to stifling Ms. Knepper's business development opportunities, Ogletree has decreased Ms. Knepper's compensation for the business she independently brings to the Firm by allowing

male shareholders to receive credit for Ms. Knepper's work. Ogletree's leadership and policies enable male shareholders to allocate origination credits to themselves for Ms. Knepper's work and the business she generates for the firm. These credit allocations have deprived Ms. Knepper of credits and compensation for her work and serve to disfavor female shareholders generally.

88.     For example, in February 2014, Ms. Knepper gave a presentation to the Laguna Beach Chamber of Commerce. During that presentation, she had a productive conversation with an insurance broker.  On April 10, 2014, the broker referred a client to Ms. Knepper for representation on an impending high stakes sexual harassment lawsuit—Ms. Knepper generated this business without involvement from any Ogletree shareholder. Ms. Knepper arranged a pitch meeting with the business owners. Within three weeks, she successfully generated this client's business for the firm.  On April 28, 2014, the client emailed Ms. Knepper to request her services specifically, rather than inquiring about Ogletree generally.  Later that day, Ms. Knepper received an email from Anthony Byergo—a male shareholder who wanted to receive 50% of the originating credit.  Even though Ms. Knepper independently generated this matter without support from the Firm or another shareholder, Mr. Byergo claimed he had an unrelated previous relationship with the client's insurance company. Ms. Knepper appealed Mr. Byergo's allocation, but the Firm forced her to yield to Mr. Kim Ebert, the Firm's then-managing shareholder and final arbiter of credit allocations. Mr. Ebert assigned Mr. Byergo 40% of the origination credit for a matter that he did not contribute to and performed no work on whatsoever, while Ms. Knepper managed 100% of the matter.

89.     This is but one example of Ogletree's credit allocation policies, which provide male shareholders with credits at the cost of the female shareholders who actually do the work.  Ogletree then uses the resulting credit disparity as pretext to compensate and promote female shareholders such as Ms. Knepper at lower levels than the male shareholders who receive credit for female shareholders' work.

90.     Ogletree assigned Ms. Knepper to flat-rate cases that arbitrarily limited the credits she earned, regardless of her performance.  For example, in 2016, Ron Chapman arranged for a flat-rate client fee on one of Ms. Knepper's cases. Under this agreement, Ms. Knepper was required to handle an entire case, including discovery and arbitration, but could only bill $100,000.   The case accumulated

approximately over $400,000 in fees and required Ms. Knepper to write off hundreds of hours of her time that could have been used to accumulate credits on other matters or develop her book of business. This directly impacted Ms. Knepper's efficiency rating, which is evaluated by the Compensation Committee, as well as the fact that she is judged on dollars collected, not billed.

91.     Ogletree also assigns a disproportionate amount of Employment Practices Liability Insurance ("EPLI") cases to female shareholders. EPLI cases frequently come with pre-negotiated billing rates that are lower than shareholders' normal rates.  This pattern and practice artificially deflates female shareholders' compensation credits by decreasing the value placed on their work.

92.     Ms. Knepper has complained to the Firm's Compensation Committee about the disproportional amount of EPLI work she has been tasked with and the effect it has on her compensation, but Ogletree has not rectified the pay disparity.

93.     Male attorneys at Ogletree have made clear that when new clients come to the Firm through to an initial EPLI contact, the origination credits for the attorney with the insurance company relationship will be reduced and the origination credits for the attorney with the client relationship will increase.  The standard formula is that origination credits will be allocated 100% to the insurance attorney during the first case, 75% in the second case, 50% in the third case and 0% by the fourth case.  Female attorneys, however, are expected to give 100% of the origination credits to the insurance attorney no matter how much business they are able to generate for the client who happens to have the insurance policy – even on matters that are not covered by insurance.

          iv.     Ogletree Discriminated Against Ms. Knepper in Promotions

94.     Ms. Knepper has performed at equal or higher levels than male equity shareholders since at least 2013.  Since 2016, Ms. Knepper has requested to be promoted to equity shareholder.

95.     Ogletree's male leadership has denied her promotion by applying subjective and discriminatory standards.

96.     For example, in 2012, Managing Shareholder Keith Watts had approximately $457,000 of originations, approximately $300,000 less than the standard for promotion to equity shareholder.  Mr. Watts also billed approximately 1,601 hours, approximately 200 under the standard.  By contrast, Ms.

Knepper had higher origination credits that year, substantially similar responsible credits, higher working credits, and approximately 500 more billable hours in 2012.  Despite this, Ogletree promoted Mr. Watts over Ms. Knepper to equity shareholder in 2013, even though Ms. Knepper vastly outperformed Mr. Watts.  Ogletree then paid Mr. Watts approximately $125,000 more than Ms. Knepper in 2013 target compensation alone, before equity profit-sharing distributions.

97.   Ms. Knepper continued to outperform Mr. Watts.  In 2013, Ms. Knepper had approximately $368,000 more originations credits than Mr. Watts, approximately $73,000 more working credits, and approximately 472 more billable hours.

98.   As a further example, in 2012, Evan Moses, a shareholder in the Los Angeles office, earned less than half of the $750,000 of originations that were required for promotion to equity shareholder. Regardless, Ogletree promoted Mr. Moses to equity shareholder status.  Even with the discriminatory support of the Firm's predominantly-male leadership, Mr. Moses continued to fall below the origination requirement in 2013 and 2014.  However, Ogletree now pays Mr. Moses approximately $235,000 more than Ms. Knepper in target compensation and bonuses.  Including equity profit-sharing distributions, Mr. Moses's total compensation, on information and belief, is approximately over $400,000 more than Ms. Knepper's.

99.   Ms. Knepper met every single credit requirement for promotion to equity shareholder in 2016, with approximately $797,000 of originating credits ($750,000 standard), approximately $767,000 of managing credits ($750,000 standard), approximately $584,000 of working credits ($500,000 standard), and approximately 1,800 billable hours (1,800 standard).

100.   On November 8, 2016, Ms. Knepper emailed Ogletree's managing shareholder, Matt Keen, and notified him that she was on track to meet all of the criteria and wanted to pursue promotion to equity status.

101.   Ogletree had no excuse not to promote Ms. Knepper.  Ogletree declined to promote Ms. Knepper or even address the topic in her compensation review, later relying on the new, pretextual three-year requirement.  This ostensible three-year requirement is one of the Firm's moving-target criteria that predominately male equity shareholders apply to deny female shareholders pay and promotions. But the

Firm does not consistently apply the same criteria to male shareholders. Under this purported rule, female attorneys are denied promotions unless they have satisfied the credit-allocation thresholds for each of the three prior years. The Firm's written policy only requires attorneys to meet their credit allocations for the single year prior to promotion.

102.   In 2017, Ogletree promoted Kevin Bland to equity shareholder, based on his 2016 credit allocations and ignored that Mr. Bland only satisfied the reported standards for one of the three relevant years.  Ogletree now pays Mr. Bland a salary that exceeds Ms. Knepper's by approximately $60,000. Including equity profit-sharing distributions, Mr. Bland's total compensation may exceed Ms. Knepper's by approximately $200,000.

v.   <u>Ogletree Retaliated Against Plaintiff Knepper for Engaging in Protected Activity</u>

103.   Ms. Knepper has complained about and resisted Ogletree's discriminatory policies and harassment since at least 2012.

104.   In response to Ms. Knepper's complaints, Mr. Watts and others denied Ms. Knepper compensation, credits, business development, and other important facets of employment disproportionately afforded to male shareholders.

105.   Mr. Watts has routinely refused to fund Ms. Knepper's business development initiatives and rejected Ms. Knepper's expense requests without cause, while he has funded and supported male shareholders without hesitation.

106.   Ms. Knepper complained about Mr. Watts's retaliatory behavior to Joe Beachboard, the Firm's Co-Managing Shareholder, both via email and a direct phone call in March 2017.  Ms. Knepper had previously submitted information to Mr. Beachboard in October 2016, alerting him to concerning behavior by Mr. Watts.  Mr. Beachboard failed to follow up with Ms. Knepper in any way.  In July 2017, Mr. Watts sent an email to all of the Orange County shareholders that was hostile to Ms. Knepper.  Ms. Knepper complained to him directly and at Ms. Knepper's request, the Firm launched an investigation. As part of this investigation, Ms. Knepper again reported the discrimination, harassment, retaliation, and hostile work environment to the Firm's leadership.  Shortly after the investigation commenced, Mr. Verde became the Office Managing Shareholder of the Orange County office.   Four months after the

investigation commenced, the Firm responded by refusing to acknowledge its wrongdoing and dismissing Ms. Knepper's complaints.

> vi.   Ogletree Subjected Ms. Knepper to a Hostile Work Environment

107.   Ogletree's predominantly male leadership has consistently demeaned and disrespected Ms. Knepper and other female non-equity shareholders on account of their gender.

108.   Mr. Watts, whose office was previously comprised exclusively of male shareholders, resisted even meeting Ms. Knepper regarding her potential move to his office.  Within months of arriving in the Orange County office, Mr. Watts and Vince Verde, both co-managing shareholders at the time, pulled Ms. Knepper into Mr. Watts's office and told her she had become a polarizing figure in the office.

109.   On October 7, 2016, without any warning or explanation, Mr. Watts announced to the whole office that "a creepy killer clown has been seen in the ladies' restroom… repeat … a creepy killer clown has been seen in the ladies' restroom," via an intercom on all of the phones in the Orange County office.  This inappropriate behavior is representative of the work environment that Ogletree has fostered in the Orange County office.  Ms. Knepper forwarded documentation of this incident to Joe Beachboard on October 21, 2016, along with one of Mr. Watts's emails castigating the entire office for their lack of interest in one of his intra-office social events and a number of other examples of Mr. Watts's inappropriate behavior.  Mr. Beachboard never responded to Ms. Knepper's request to discuss them.  Ms. Knepper repeated her complaints regarding Mr. Watts to Mr. Beachboard, both via email and a direct phone call in March 2017.  Mr. Beachboard failed to follow up with Ms. Knepper in any way.

110.   Mr. Bland has made numerous inappropriate comments of a sexual nature. Mr. Bland made a joke about two dogs "fucking" during the interview of a young female associate candidate and likewise made a joke during the interview of a male attorney that his wife "must be tolerant of his needs," because he has a lot of children.

111.   Mr. Bland has also made a comment to the female Office Manager of the Orange County office during a shareholder meeting that she had a "friend with benefits," greatly embarrassing her and everyone else in the room.

## VI.   CLASS ACTION AND COLLECTIVE ACTION ALLEGATIONS

### A. CLASS AND COLLECTIVE DEFINITIONS

112.   Class Representative seeks to maintain claims on her own behalf and on behalf of Classes of similarly situated female non-equity shareholders employed by Ogletree.

113.   The proposed Rule 23 "**Nationwide Class**" consists of all female non-equity shareholders who are, have been, or will be employed by Ogletree in the United States at any time on or after August 18, 2014.  Upon information and belief, there are approximately 97 members of the proposed Class.

114.   The proposed "**California Subclass**" means female non-equity shareholders employed by Ogletree in California at any time on or after August 18, 2013.  Upon information and belief, there are approximately 18 members of the proposed subclass.

115.   "**The EPA Collective Action**," or "**Collective Action Plaintiffs**" means women employed as non-equity shareholders at Ogletree in the United States at any time on or after August 18, 2014 who opt into this action under 29 U.S.C. §216(b).

116.   Class Representative and the employees whom she seeks to represent have been subjected to systemic disparate treatment in pay and promotion at Ogletree based on their gender. Further, Ogletree's centralized pay and promotion policies and practices have caused a gender-based disparate impact on Class Representative and the Classes she seeks to represent.

117.   Because of the Firm's systemic pattern and practice of gender discrimination in pay and promotion, Class Representative and the Classes that she seeks to represent have been adversely affected and have experienced harm, including the loss of compensation, employment benefits, and promotional opportunities, as well as physical and emotional pain and suffering.

118.   Class Representative seeks to maintain claims on her own behalf and on behalf of the foregoing Classes of similarly situated female non-equity shareholders.  Class Representative seeks to represent all of the female employees described above.

119.   The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

**B. CLASS ALLEGATIONS (TITLE VII)**

    **a. OGLETREE ENGAGED IN A COMMON POLICY, PATTERN, AND PRACTICE OF DISCRIMINATION AGAINST THE CLASS**

120.    Plaintiff re-alleges and incorporates by reference allegations from previous paragraphs of the Complaint alleging class-based discrimination against female non-equity shareholders.

121.    Ogletree has subjected female non-equity shareholders to a pattern and practice of systemic unlawful disparate treatment and unlawful disparate impact discrimination comprised of (a) paying female non-equity shareholders less than their male counterparts; and (b) denying female non-equity shareholders promotion and advancement opportunities resulting in their relegation to lower compensation levels.

122.    These problems affecting pay and promotion are systemic and Firm-wide. They stem from the Firm's common employment policies, practices, and procedures, including Ogletree's credit allocation, compensation, job assignment, and promotion policies, practices, and procedures. Such policies, practices, and procedures are not valid, job-related, or justified by business necessity and all suffer from: a lack of transparency; inadequate quality standards and controls; insufficient implementation metrics; and inadequate opportunities for redress or challenge. As a result, female non-equity shareholders are compensated and promoted within a system that is insufficiently designed or implemented to consistently, reliably, or equitably manage or reward employees.

123.    It is Ogletree's standard operating procedure to discriminate against female non-equity shareholders. Ogletree's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to female non-equity shareholders throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups.

124.    These problems affecting pay and promotion also stem from centralized decision-making by the Firm's compact and predominately male senior leadership team, which maintains centralized control over employees' terms and conditions of employment and is responsible for formulating, reviewing, and approving the acts, policies, and practices that result in the systemic unlawful disparate treatment and unlawful disparate impact on female non-equity shareholders in pay, promotion, and

assignments.

### b. EFFICIENCY OF CLASS PROSECUTION OF COMMON CLAIMS

125.   Certification of the foregoing Classes of female non-equity shareholders is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representative and the respective Classes.

126.   The individual claims of the Class Representative require resolution of the common questions concerning whether the Firm has engaged in a systemic pattern and/or practice of gender discrimination against female non-equity shareholders in pay and promotion and/or whether its facially neutral policies have an adverse effect on the Classes' pay and promotion.  The respective Classes seek remedies to eliminate the adverse effects of such discrimination in pay and promotion.

127.   Class Representative has standing to seek such relief because of the adverse effects that such discrimination has had on her individually and on similarly situated female non-equity shareholders generally.  Ogletree caused their injuries through its discriminatory policies, practices, and procedures, and through the disparate impact its policies, practices, and procedures have on female non-equity shareholders.

128.   To gain such relief for herself, as well as for the respective Class members, the Class Representative will first establish the existence of systemic gender discrimination as the premise for the relief she seeks.

129.   Unless the proposed Classes are certified, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed Classes is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representative, the proposed Classes, and the Defendant.

### c. NUMEROSITY AND IMPRACTICABILITY OF JOINDER

130.   The Classes that the Class Representative seeks to represent are too numerous to make joinder practicable.  The members of the proposed Classes are diffused throughout California and the country. Fear of retaliation is also likely to undermine the possibility of joinder.

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT

23

### d.  COMMON QUESTIONS OF LAW AND FACT

131.    The prosecution of the claims of the Class Representative will require the adjudication of numerous questions of law and fact common to their claims and those of the Classes that she seeks to represent.

132.    The common questions of law include: (a) whether Ogletree has engaged in unlawful, systemic gender discrimination in its work assignment, credit allocation, business development, promotion, and compensation policies, practices, and procedures; (b) whether the failure to institute adequate standards, quality controls, implementation metrics, or oversight in work assignment, credit allocation, business development, promotion, and compensation policies, practices, and procedures violates Title VII, the FEHA, or the CEPA; (c) whether the lack of transparency and of opportunities for redress in those systems violates Title VII, the FEHA, or the CEPA; (d) whether Ogletree's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII, the FEHA, or the CEPA; (e) whether Ogletree is liable for a continuing systemic violation of Title VII, the FEHA, or the CEPA; (f) a determination of the proper standards for proving a pattern or practice of discrimination by the Firm against its female non-equity shareholders, and under the disparate treatment theory of liability for non-equity shareholders; and (g) a determination of the proper standard for proving that Ogletree's facially neutral employment practices had a disparate impact on each Class.

133.    The common questions of fact include whether the Firm has, through its policies, practices, and procedures: (a) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress;  (b) used that compensation system to compensate female non-equity shareholders less than similarly-situated male shareholders; (c) systemically, intentionally, or knowingly compensated female non-equity shareholders less than similarly-situated male shareholders; (d) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (e) used that promotion system to preclude or delay the promotion of female non-equity shareholders into higher positions; (f) systematically, intentionally, or knowingly precluded or delayed

the selection and promotion of female non-equity shareholders into higher equity status; (g) systematically, intentionally, knowingly, or deliberately sowed an indifference to evidence of discrimination in pay, promotion, and assignments or otherwise minimized, ignored, or mishandled evidence of or complaints of gender discrimination in pay, promotion, and assignment; and (h) otherwise discriminated against female non-equity shareholders in the terms and conditions of employment.

134.    The employment policies, practices, and procedures to which the Class Representative and the respective Classes are subjected were and are set by the Firm's Board of Directors and apply universally to all Class members nationwide.  These employment policies, practices, and procedures are not unique or limited to any function or business unit; rather, they apply to all offices and practice groups and thus affect Class Representative and the respective Classes in the same ways regardless of the office location or practice group in which they work.

### e.  THE TYPICALITY OF CLAIMS AND RELIEF SOUGHT

135.    The claims of the Class Representative are typical of the claims of the respective Classes.

136.    Gender discrimination in pay and promotion affects the Class Representative and all Class members in the same or similar ways throughout the Firm.  Class Representative and similarly situated female non-equity shareholders were paid less than similarly situated male shareholders for equal work and were denied promotion and advancement opportunities in favor of similarly situated male shareholders.

137.    The relief necessary to remedy the claims of the Class Representative is exactly the same as that necessary to remedy the claims of the Class members in this case.

138.    Class Representative seeks the following relief for her individual claims and for those of the members of the proposed Classes: (a) a declaratory judgment that Defendant has engaged in systemic gender discrimination against the Classes by (1) paying female non-equity shareholders less than their male counterparts; and (2) denying female non-equity shareholders promotion and advancement opportunities in favor of male shareholders; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effectuates a restructuring of the Firm's promotion, compensation, and discipline policies, practices, and procedures; (d) back pay, front pay, and other

equitable remedies necessary to make the female non-equity shareholders whole from Ogletree's discrimination; (e) punitive and nominal damages to prevent and deter Ogletree from engaging in similar discriminatory practices in the future; (f) compensatory damages; and (g) attorneys' fees, costs, and expenses.

### f.   ADEQUACY OF REPRESENTATION

139.   The Class Representative's interests are co-extensive with those of the respective Classes that she seeks to represent in this case.   The Class Representative seeks to remedy Ogletree's discriminatory employment policies, practices, and procedures so that female non-equity shareholders will not receive disparate pay and differential treatment.

140.   The Class Representative is willing and able to represent the proposed Classes fairly and vigorously as she pursues their similar individual claims in this action.

141.   Class Representative has retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience, and resources of counsel to litigate competently the Class claims at issue in this case satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### g.   REQUIREMENTS OF RULE 23(b)(2)

142.   Ogletree has acted on grounds generally applicable to the Class Representative and the Classes by adopting and following systemic policies, practices, and procedures that affect all Class Members.

143.   Ogletree has acted or refused to act on grounds generally applicable to the Class Representative and the proposed Classes. Ogletree's systemic conduct justifies the requested injunctive and declaratory relief with respect to the Classes as a whole.

144.   Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of Ogletree's systematic gender discrimination.  In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for the monetary and non-monetary remedies

for individual losses caused by Ogletree's discriminatory conduct.

145.    Certification of Plaintiff's claims for injunctive relief is thus appropriate.

**h.  REQUIREMENTS OF RULE 23(b)(3)**

146.    The common issues of fact and law affecting the claims of the Class Representative and proposed Class members, including, but not limited to, the common issues previously identified herein, predominate over any issues affecting only individual claims.  These common issues include whether the Firm has engaged in gender discrimination against female non-equity shareholders by (a) paying female non-equity shareholders less than their male counterparts; and (b) denying female non-equity shareholders promotion and advancement opportunities in favor of male shareholders.

147.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representative and members of the respective Classes.

148.    The cost of proving the patterns and practices of discrimination by Defendant makes it impracticable for the Class Representative and members of the respective Classes to prosecute their claims individually.

149.    By virtue of the pattern and practice of discrimination at Ogletree, the Class Representative and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, compensatory damages, and nominal and punitive damages.

**i.  CLASS TREATMENT OF PARTICULAR ISSUES UNDER RULE 23(c)(4)**

150.    Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class members.

**C. COLLECTIVE ACTION ALLEGATIONS (EPA)**

151.    The Firm has engaged in systematic gender discrimination against its female non-equity shareholders.  The Firm has caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices, and procedures.

152.    Plaintiff re-alleges and incorporates by reference each and every allegation in the previous

paragraphs alleging common policies, practices, and procedures resulting in unequal pay earned by female non-equity shareholders at Ogletree.

153.   Plaintiff (or "EPA Collective Action Plaintiff") brings collective claims alleging violations of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of all members of the EPA Collective Action.

154.   The EPA Collective Action Plaintiff seeks to represent all female non-equity shareholders described above who were paid less than male shareholders for doing similar work.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

155.   Questions of law and fact common to the EPA Collective Action Plaintiff and the EPA Collective as a whole include but are not limited to the following:

(a)   Whether Ogletree unlawfully failed and continues to fail to compensate female non-equity shareholders at a level commensurate with similarly-situated male shareholders;

(b)   Whether Ogletree's policy, practice, or procedure of failing to compensate female non-equity shareholders at a level commensurate with comparable male shareholders violates applicable provisions of the EPA; and

(c)   Whether Ogletree's failure to compensate female non-equity shareholders at a level commensurate with comparable male shareholders was willful within the meaning of the EPA.

156.   Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiff, because her claims are similar to the claims of the EPA Collective.

157.   The EPA Collective Action Plaintiff and the EPA Collective (a) are similarly situated; and (b) are subject to Ogletree's common compensation policies, practices, and procedures resulting in unequal pay based on sex by failing to compensate female non-equity shareholders at a level commensurate with male shareholders who perform substantially equal work and/or hold equivalent levels, job titles, and positions.

**D.  PRIVATE ATTORNEYS GENERAL ACT ("PAGA") ALLEGATIONS**

158.   Ogletree has violated Plaintiff's and current and former female attorneys' rights under the

California Labor Code, including the California Equal Pay Act, Section 1197.5.

159.    Plaintiff seeks to represent and to recover civil penalties on behalf of herself and other Similarly Aggrieved Current and Former Female Attorneys, who worked in California at any time on or after a date one year prior to the filing of Plaintiff's Labor and Workforce Development Agency Notice.

160.    Plaintiff gave written notice of the violation alleged herein by online filing with the California Labor and Workforce Development Agency on January 12, 2018.

161.    These violations are continuing and ongoing.  On behalf of herself and other Similarly Aggrieved Current and Former Female Attorneys, Plaintiff seeks civil penalties for Ogletree's violations of the California Labor Code, including, without limitation, Sections 204, 204c, 204.2, 221, 223, 226, 98.6, 1102.5, and 1197.5.

162.    "**Similarly Aggrieved Current and Former Female Attorneys**" means female non-equity shareholders who worked in California for Ogletree, or any of their current and former subsidiaries and affiliated entities, at any time on or after a date one year prior to the filing of Plaintiff's Labor and Workforce Development Agency Notice.

## CLASS AND COLLECTIVE ACTION COUNTS
## COUNT 1

### GENDER DISCRIMINATION – PAY
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*)**
**(On Behalf of Class Representative, in her Individual and Representative Capacities, and the Nationwide Class)**

163.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

164.    This Count is brought on behalf of Plaintiff in her individual and representative capacities, and all members of the Class.

165.    Ogletree has discriminated against the Plaintiff and the Class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

166.    Ogletree has engaged in an intentional, company-wide and systemic policy, pattern, and/or practice of discrimination against Plaintiff and the Class by, among other things: maintaining a discriminatory system of determining salaries and other compensation incentives; maintaining discriminatory credit allocation system; discrimination in assignments; maintaining a discriminatory system for promotions; and other forms of discrimination.

167.    These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on Plaintiff and the members of the Class with respect to the terms and conditions of their employment.

168.    Ogletree has treated Plaintiff and the Class differently from and less preferentially than similarly-situated male shareholders with respect to starting compensation and raises in ways constituting disparate treatment and disparate impact discrimination.

169.    Ogletree has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

170.    Ogletree's conduct has been intentional, deliberate, willful, malicious, reckless, oppressive and conducted in callous disregard of the rights of the Class Representative and all members of the Class, entitling the Class Representative and all members of the class to punitive damages.

171.    As a result of Ogletree's conduct alleged in this Complaint, the Class Representative and the members of the Class have suffered and continue to suffer harm, including but not limited to, lost earnings and other financial loss, as well as non-economic damages.

172.    By reason of the continuous nature of Ogletree's discriminatory conduct, which persisted throughout the employment of the Class Representative and the members of the Class, the continuing violations doctrine applies to all violations alleged herein.

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT
30

173.     By reason of Ogletree's discrimination, the Class Representative and the members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of compensatory and punitive damages.  Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT 2**

**GENDER DISCRIMINATION –PROMOTIONS**

**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.)**

**(On Behalf of Class Representative, in her Individual and Representative Capacities, and the Nationwide Class)**

174.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

175.     This Count is brought on behalf of Plaintiff in her individual and representative capacities, and all members of the Class.

176.     Ogletree has discriminated against the Plaintiff and the Class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq*., as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

177.     Ogletree has engaged in an intentional, company-wide and systemic policy, pattern, and/or practice of discrimination against Plaintiff and the Class by, among other things: maintaining discriminatory credit allocation systems; discrimination in assignments; maintaining a discriminatory system for promotions; and other forms of discrimination.

178.     These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on Plaintiff and the members of the Class with respect to the terms and conditions of their employment.

179.     As a result of this disparate treatment and disparate impact discrimination, Ogletree has

treated Plaintiff and the Class differently from and less preferentially than similarly-situated male shareholders with respect to promotions.

180. Ogletree has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

181. Ogletree's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representative and all members of the Class, entitling the Class Representative and all members of the class to punitive damages.

182. As a result of Ogletree's conduct alleged in this Complaint, the Class Representative and the members of the Class have suffered and continue to suffer harm, including but not limited to, lost earnings and other financial loss, as well as non-economic damages.

183. By reason of the continuous nature of Ogletree's discriminatory conduct, which persisted throughout the employment of the Class Representative and the members of the Class, the continuing violations doctrine applies to all violations alleged herein.

184. By reason of Ogletree's discrimination, the Class Representative and the members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of compensatory and punitive damages. Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## **COUNT 3**

### **DENIAL OF EQUAL PAY FOR EQUAL WORK**

**(The Fair Labor Standards Act of 1938, *as amended by* The Equal Pay Act, 29 U.S.C. §§ 206, *et seq.*)**

**(On Behalf of Class Representative, in her Individual and Representative Capacities and the Collective Action Plaintiffs)**

185. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

186. This Count is brought on behalf of Plaintiff in her individual and representative capacities,

and Collective Action Plaintiffs.

187.    Ogletree has discriminated against the Class Representative and Collective Action Plaintiffs in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq*., as amended by the Equal Pay Act of 1963 ("EPA").  Ogletree has paid Class Representative and Collective Action Plaintiffs less than similarly-situated male colleagues performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

188.    Ogletree has subjected the Class Representative and the Collective Action Plaintiffs to common discriminatory pay policies, including: a discriminatory system of determining salaries and other compensation incentives, which results in shareholders performing the same tasks receiving different compensation; and other forms of discrimination affecting pay.

189.    The differential in pay between male and female shareholders was not due to seniority, merit, quantity, or quality of production, but was due to gender.

190.    Ogletree has caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA.  Moreover, the foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Ogletree has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

191.    As a result of Ogletree's conduct alleged in this Complaint, Class Representative and all Collective Action Plaintiffs have suffered and will continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

192.    By reason of Ogletree's discrimination, Class Representative and all Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA including liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).  Attorneys' fees should be awarded under 29 U.S.C. § 216(b).

## COUNT 4

### GENDER DISCRIMINATION – PAY AND PROMOTIONS

**(California Fair Employment and Housing Act, Cal. Gov. Code § 12940, *et seq*.)**

**(On Behalf of Class Representative, in her Individual and Representative Capacities, and the California Subclass)**

193.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

194.    This Count is brought on behalf of Plaintiff in her individual and representative capacities, and all members of the California Subclass.

195.    Ogletree has discriminated against Plaintiff and the California Subclass in violation of the California Fair Employment and Housing Act (the "FEHA"), Cal. Gov't Code § 12940, *et seq.*, by subjecting them to different treatment because and on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

196.    Ogletree has engaged in an intentional, company-wide and systemic policy, pattern, and/or practice of discrimination against Plaintiff and the California Subclass by, among other things: maintaining a discriminatory system of determining salaries and other compensation incentives; discrimination in assignments; maintaining a discriminatory system of credit allocation; maintaining a discriminatory system for promotions; and other forms of discrimination.

197.    These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on Plaintiff and the members of the California Subclass with respect to the terms and conditions of their employment.

198.    As a result of this disparate treatment and disparate impact discrimination, Ogletree has treated Plaintiff and California Subclass differently from and less preferentially than similarly-situated male shareholders with respect to compensation, raises, job assignments, and promotions.

199.    Ogletree has failed to prevent, respond to, adequately investigate, and/or appropriately

resolve this gender discrimination.

200.    Ogletree's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representative and all members of the California Subclasses, entitling the Class Representative and all members of the Nationwide and California Subclasses to punitive damages.

201.    As a result of Ogletree's conduct alleged in this Complaint, the Class Representative and the members of the California Class have suffered and continue to suffer harm, including but not limited to, lost earnings and other financial loss, as well as non-economic damages.

202.    By reason of the continuous nature of Ogletree's discriminatory conduct, which persisted throughout the employment of the Class Representative and the members of the California Class, the continuing violations doctrine applies to all violations alleged herein.

203.    By reason of Ogletree's discrimination, the Class Representative and the members of the California Class are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

204.    Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

<u>**COUNT 5**</u>

**DENIAL OF EQUAL PAY FOR EQUAL & SUBSTANTIALLY SIMILAR WORK**

**(California Equal Pay Act, as amended by The California Fair Pay Act, Cal. § 1197.5, *et seq*.;**

**California Equal Pay Act, Cal. Lab § 1197.5 (West 2015) (amended 2015))**

**(On Behalf of the Class Representative, in her Individual and Representative Capacities, and the**

**CEPA Class)**

205.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

206.    This Count is brought on behalf of Plaintiff in her individual and representative capacities, and all members of the CEPA Class.

207.    Ogletree has discriminated against the Plaintiff and all members of the CEPA Class in

violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq*. Ogletree has paid Class Representative and members of the CEPA Class less than similarly-situated male shareholders in the same establishment performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

208.    Ogletree has discriminated against the Plaintiff and all members of the CEPA Class in violation of the California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5 *et seq*. Ogletree has paid Class Representative and members of the CEPA Class less than similarly-situated male shareholders performing substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

209.    Ogletree has subjected the Class Representative and the members of the CEPA Class to common discriminatory pay policies, including: a discriminatory system of determining salaries and other compensation incentives; a discriminatory system for promotions, which results in shareholders performing the same tasks receiving different compensation; and other forms of discrimination affecting pay.

210.    The differential in pay between male and female shareholders was not due to seniority, merit, or the quantity or quality of production, a bona fide factor other than sex, such as education, training, or experience, but was due to gender.  In the alternative, to the extent that Ogletree relied upon one or more of these factors, said factor(s) were not reasonably applied and did/do not account for the entire wage differential.

211.    Ogletree caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex.  Moreover, the foregoing conduct constitutes a willful violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq*., and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5 *et seq*.  Therefore, a three-year statute of limitations applies to such violations, pursuant to California Equal Pay Act, Cal. Lab. Code § 1197.5(h) (West 2015) (amended 2015), *et seq*., and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5(h).

212.    As a result of Ogletree's conduct alleged in this Complaint and/or Ogletree's willful,

knowing, and intentional discrimination, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

213.    Plaintiff and the CEPA Class are therefore entitled to all legal and equitable remedies, including doubled compensatory awards for all willful violations.

214.    Attorneys' fees should be awarded under California Labor Code § 1197.5(g).

## <u>COUNT 6</u>

**UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE**

**California Business and Professions Code § 17200 *et seq.***

**(On Behalf of the Class Representative, in her Individual and Representative Capacities, and the California Subclass and CEPA Class)**

215.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

216.    This Count is brought on behalf of Plaintiff in her individual and representative capacities, and all members of the California Subclass and CEPA Class.

217.    Ogletree is a "person" as defined under California Business & Professions Code § 17021.

218.    Ogletree's willful failure to pay female non-equity shareholders equally and to otherwise offer female non-equity shareholders equal employment opportunities as alleged above, constitutes unlawful, unfair, and/or fraudulent activity prohibited by California Business and Professions Code §17200.  As a result of their unlawful, unfair, and/or fraudulent acts, Ogletree reaped and continue to reap unfair benefits and illegal profits at the expense of Plaintiff and the California Class and CEPA Class. Ogletree should be enjoined from this activity.

219.    Accordingly, Plaintiff and the California Class members are entitled to restitution with interest and other equitable relief, pursuant to Cal. Bus. & Prof. Code §17203.

## COUNT 7

**CLAIMS UNDER THE PRIVATE ATTORNEYS GENERAL ACT OF 2004**

**(Cal. Lab. Code §2698 *et seq.*)**

**(On Behalf of the Class Representative, in her Individual and Representative Capacities, and the Similarly Aggrieved Current and Former Female Attorneys)**

220.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

221.    Plaintiff is an aggrieved employee.  Plaintiff brings this claim on behalf of herself and other Similarly Aggrieved Current and Former Female Attorneys.

222.    The California Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, *et seq.*, gives any employee aggrieved by an employer's violation of the Labor Code the right to file an action on behalf of Similarly Aggrieved Current and Former Female Attorneys for the civil penalties established by Section 2698 and/or other Labor Code sections.

223.    Plaintiff, on behalf of herself and other Similarly Aggrieved Current and Former Female Attorneys, seeks civil penalties for Ogletree's violations of the California Labor Code, including, without limitation, the following: (a) being deprived of equal pay, in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq.*, and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5 *et seq*; (b) retaliation in violation of Cal. Lab. Code §§ 98.6, 1102.5, and 1197.5(k); (c) untimely payment in violation of Cal. Lab. Code §§ 204, 204c, and 204.2; inaccurate wage statements in violation of Cal. Lab. Code § 226.  These violations were willful and intentional.

224.    Accordingly, Plaintiff is entitled to collect civil penalties on behalf of herself and other Similarly Aggrieved Current and Former Female Attorneys against Ogletree as allowed under Cal. Lab. Code § 2699(a) and (f) and costs and attorneys' fees under Cal. Lab. Code. § 2699(g).

## INDIVIDUAL COUNTS

## COUNT 8

### RETALIATION

**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f), *et seq*.; California Fair Employment and Housing Act, Cal. Gov. Code § 12940, *et seq*.)**

**(On Behalf of Plaintiff)**

225.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

226.    Plaintiff engaged in protected activity that included, but is not limited to, complaining to Ogletree about gender discrimination in compensation and promotion.  She complained to members of the Firm on numerous occasions.

227.    Ogletree engaged in adverse employment actions against Plaintiff for engaging in protected activities.  These adverse employment actions have included subjecting her to unfavorable terms and conditions of employment, including denials of promotion and subjection to a hostile work environment. The adverse employment actions have materially and adversely affected Plaintiff's overall terms and conditions of employment.

228.    Ogletree's retaliatory acts against Plaintiff were a direct and proximate result of her protected activities.

229.    A reasonable employee would find Ogletree's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

230.    Ogletree's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff, entitling her to punitive damages.

231.    As a result of Ogletree's conduct alleged in this complaint, Plaintiff has suffered and continue to suffers harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

232.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII

and the FEHA, including an award of punitive damages.

233.     Attorney's fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 9

## RETALIATION

**(Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963, 29 U.S.C. § 215(a)(3); California Equal Pay Act, as amended by The California Fair Pay Act, Cal. § 1197.5, *et seq*.; California Equal Pay Act, Cal. Lab § 1197.5 (West 2015) (amended 2015))**

**(On behalf of Plaintiff)**

234.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

235.     Plaintiff engaged in protected activity under the Equal Pay Act by complaining to Ogletree about gender discrimination in compensation.

236.     Ogletree engaged in adverse employment actions against Plaintiff for engaging in protected activities.  These adverse employment actions have included subjecting them to unfavorable terms and conditions of employment, including denials of promotion and subjection to a hostile work environment. The adverse employment actions have materially and adversely affected Plaintiff's overall terms and conditions of employment.

237.     Ogletree's retaliatory acts against Plaintiff were a direct and proximate result of their protected activities.

238.     A reasonable employee would find Ogletree's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

239.     As a result of Ogletree's conduct alleged in this complaint, Plaintiff has suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

240.     Under 29 U.S.C. § 216(b) and the CEPA, Plaintiff is entitled to liquidated damages and other relief.

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT

241. Attorneys' fees and costs should be awarded under 29 U.S.C. § 216(b) and the CEPA.

## VII. **PRAYER FOR RELIEF ON INDIVIDUAL, CLASS ACTION, AND COLLECTIVE ACTION CLAIMS**

WHEREFORE, Plaintiff, on her own behalf and on behalf of the Class, the EPA Collective Action, and the PAGA Representative Action, pray that this Court:

A. Certify the claims in Counts 1 and 2 as a class action maintainable under Federal Rules of Civil Procedure Rule 23(a), (b)(2) and/or (b)(3), or certify particular issues within those claims as class issues under Rule 23(c)(4), on behalf of the proposed Classes; designate the proposed Class Representative as representative; and designate Plaintiff's counsel of record as Class Counsel for each Class;

C. Certify the claims in Count 3 as a collective action under the EPA on behalf of the Collective Action Representatives and the EPA Collective Action; promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the Collective Action, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and toll the statute of limitations on the claims of all members of the Collective Action from the date the original Complaint was filed until the Collective Action members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Collective Action Plaintiffs;

D. Declare and adjudge that Ogletree's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of the Plaintiff, Members of the Classes, and Members of the EPA Collective Action;

E. Issue a permanent injunction against Ogletree and Ogletree's partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any conduct violating the rights of the Plaintiff, Members of the Classes, Members of the EPA Collective Action, and those similarly situated as secured by Title VII and the Equal Pay Act, and order such injunctive relief as will prevent Ogletree from continuing their discriminatory practices and from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

1
2
3

      F.     Order Ogletree to adjust the wage rates and benefits for the Plaintiff, Members of the Classes, and Members of the EPA Collective Action to the level that they would be enjoying but for Ogletree's discriminatory policies, practices, and/or procedures;

4
5
6

      G.     Award back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the Plaintiff, Members of the Classes, and Members of the EPA Collective Action, in an amount not less than $100,000,000.

7
8

      H.     Award nominal, liquidated, and compensatory damages to Plaintiff and Members of the Classes, in an amount not less than $100,000,000.

9
10

      I.     Award punitive damages to Plaintiff and Members of the Classes, in an amount not less than $100,000,000.

11

      J.     Award penalties available under applicable laws, including waiting time penalties;

12
13

      K.     Order Ogletree to make whole the Plaintiff, Members of the Classes, and Members of the EPA Collective Action by providing them with any other monetary and affirmative relief;

14
15

      L.     Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Plaintiff, Members of the Classes, and Members of the EPA Collective Action;

16
17

      M.     Award Plaintiff, Members of the Classes, and Members of the EPA Collective all pre-judgment interest and post-judgment interest available under law;

18
19

      N.     Award Plaintiff, Members of the Classes, and Members of the EPA Collective Action any other appropriate equitable relief, including reinstatement;

20
21
22

      O.     Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Ogletree has remedied the practices complained of herein and are determined to be in full compliance with the law; and

23

      P.     Award additional and further relief as this Court may deem just and proper.

24

## VIII.  JURY DEMAND

25

Plaintiff demands a trial by jury on all issues triable of right by jury.

26
27
28

---

Case No. 3:18-cv-00303
CLASS AND COLLECTIVE ACTION COMPLAINT

Dated: January 12, 2018                 Respectfully submitted,


                                        /s/ Jill Sanford
                                        David Sanford (*Pro Hac Vice forthcoming*)
                                        Jill Sanford (CA Bar No. 185757)
                                        Edward Chapin (CA Bar No. 53287)
                                        Jeremy Heisler (*Pro Hac Vice forthcoming*)
                                        Alexandra Harwin (*Pro Hac Vice forthcoming*)
                                        SANFORD HEISLER SHARP, LLP

                                        *Attorneys for Plaintiff and the Class*

[*Continued from Caption Page*]

James E. Richardson (NY Bar No. 4810735, *Pro Hac Vice forthcoming*)
jrichardson@sanfordheisler.com
Danielle Fuschetti (CA Bar No. 294065)
dfuschetti@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021

*Attorneys for Plaintiff and the Classes*